# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OREGONIANS FOR FLOODPLAIN PROTECTION, et al., | |
| Plaintiff, | Case No. 1:25-cv-39-JMC |
| v. | **DEFENDANT-INTERVENORS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| U.S. DEPARTMENT OF COMMERCE, et al., | |
| Defendants, | |
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, et al., | |
| Defendant-Intervenors. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

STANDARD OF REVIEW ........................................................................................................ 3

ARGUMENT ........................................................................................................................... 3

    I.    FEMA Has the Authority Under the NFIA and ESA to Implement Measures, Including Those Required by the RPA, for the Benefit of Listed Species ......................................... 4

    II.    Plaintiffs' Claims of Irreparable Harm are Speculative and Non-Imminent ...................... 8

    III.    The Public Interest in Protecting Endangered Species and in Preventing Flood Losses Weighs in Favor of Denying Plaintiffs' Motion for Preliminary Injunction ................... 16

    IV.    Any Preliminary Injunction Issued by This Court Must be Narrowly Tailored .............. 20

CONCLUSION ...................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Am. Rivers v. U.S. Army Corps of Eng'rs,*
271 F. Supp. 2d 230 (D.D.C. 2003) ..................................................................... 5, 16

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 1396 (1987) ................................................................................................ 18

*Ashland Oil, Inc. v. FTC,*
409 F. Supp. 297 (D.D.C. 1976), *aff'd,* 548 F.2d 977 (D.C. Cir. 1976) ................... 9

*Coal. for a Sustainable Delta v. FEMA,*
812 F. Supp. 2d 1089 (E.D. Cal. 2011) ..................................................................... 4

*Conservation Law Found. v. Ross,*
422 F. Supp. 3d 12 (D.D.C. 2019) ........................................................................... 16

*Doe v. Mattis,*
928 F.3d 1 (D.C. Cir. 2019) ..................................................................................... 16

*Ecological Rights Found. v. Fed. Emergency Mgmt. Agency,*
384 F. Supp. 3d 1111 (N.D. Cal. 2019) ............................................................. 4, 5, 7

*Fla. Key Deer v. Paulison,*
522 F.3d 1133 (11th Cir. 2008) .............................................................................. 6, 7

*Fla. Key Deer v. Stickney,*
864 F. Supp. 1222 (S.D. Fla. 1994) ....................................................................... 4, 7

*hiQ Labs, Inc. v. LinkedIn Corp.,*
938 F.3d 985 (9th Cir. 2019) ................................................................................... 13

*Karuk Tribe of Cal. v. United States Forest Serv.,*
681 F.3d 1006 (9th Cir. 2012) ................................................................................... 5

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ................................................................................................. 13

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ............................................................................................ 11, 12

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs,*
460 F. Supp. 3d 1030 (D. Mont. 2020) ................................................................... 13

*Nat'l Ass'n of Home Builders v. Def. of Wildlife,*
551 U.S. 644 (2007) ................................................................................................... 5

*Nat'l Mining Ass'n v. Jackson,*
768 F. Supp. 2d 34, (D.D.C. 2011) ......................................................... 9, 13, 14, 15

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
241 F.3d 722 (9th Cir. 2001) ................................................................................... 13

*Nat'l Wildlife Fed'n v. FEMA,*
345 F. Supp. 2d 1151 (W.D. Wash. 2004) .......................................................... 4, 5, 7

*Neb. Dep't of Health & Human Servs. v. Dep't of Health and Human Servs.*,
  435 F.3d 326 (D.C. Cir. 2006)................................................................... 20

*NRDC v. Evans*,
  364 F. Supp. 2d 1083 (N.D. Cal. 2003)................................................... 17

*Nw. Envtl. Def. Ctr. v. Fed. Emergency Mgmt. Agency*,
  No. 3:23-cv-01335-SI (D. Or.) ............................................................ 2, 17

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
  962 F.2d 27 (D.C. Cir. 1992)..................................................................... 7

*Power Mobility Coal. v. Leavitt*,
  404 F. Supp. 2d 190 (D.D.C. 2005).......................................................... 15

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011).................................................................... 3

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
  592 U.S. 261 (2021) .................................................................................. 1

*Winter v. Natural Res. Def. Council*, *Inc.*,
  555 U.S. 7 (2008) ....................................................................................... 3

*WP Co. LLC v. United States SBA*,
  No. 20-1240 (JEB), 2020 U.S. Dist. LEXIS 221447 (D.D.C. Nov. 24, 2020) ........................ 20

**Statutes**

42 U.S.C. § 4001(e) ....................................................................................... 6

42 U.S.C. § 4022(b) ....................................................................................... 6

42 U.S.C. § 4101 ............................................................................................ 8

42 U.S.C. § 4102(c) ....................................................................................... 6

**Regulations**

44 C.F.R. § 60.22(c)(2)................................................................................. 6

44 C.F.R. § 60.25(b) ..................................................................................... 6

44 C.F.R. § 60.3 ............................................................................................ 8

44 C.F.R. § 60.3(a)(2) ................................................................................... 2

44 C.F.R. § 60.5 ............................................................................................ 8

44 C.F.R. § 60.5(b)(2)................................................................................... 6

44 C.F.R. § 60.6(b)(1)................................................................................... 6

**Other Authorities**

Disaster Recovery Reform Act of 2018, Pub. L. No. 115-254, §1246, 132 Stat. 3185 (2018)...... 2

## INTRODUCTION

At the heart of this suit is the National Marine Fisheries Service's ("NMFS") Biological Opinion, issued on April 14, 2016, which found that the Federal Emergency Management Agency's ("FEMA") implementation of the National Flood Insurance Program ("NFIP") in Oregon was jeopardizing the continued existence of seventeen species listed as endangered or threatened under the Endangered Species Act ("ESA"), including Oregon's iconic salmonids and the Southern Resident killer whale, and destroying or adversely modifying the fish species' critical habitat.[1] The Biological Opinion's jeopardy and adverse modification determination is significant as such findings are extremely rare,[2] and sets forth NMFS's expert opinion that if FEMA does not change how it administers the NFIP in Oregon, it threatens these species' continued existence.

To avoid this outcome, the Biological Opinion contained a Reasonable and Prudent Alternative ("RPA") setting forth measures FEMA could take to avoid jeopardizing the survival and recovery of the impacted species. Relevant to Plaintiffs' Motion for Preliminary Injunction, ECF 4, the RPA included interim measures to be put in place within two years of the Biological Opinion's issuance in order to alleviate the ongoing impacts to endangered and threatened species as FEMA undertook long-term programmatic action. Biological Opinion at AR 287,[3] Defs.' Ex. 2, ECF 12-2. Congress provided an additional three years, for a total of *five years*—to go through the necessary procedures to ensure the interim measures required by the RPA were

---

[1] *See* Conservation Groups' Motion to Intervene, ECF 9, at 1–14 for background on the National Flood Insurance Program, the Biological Opinion, and Conservation Groups' strong interest in the disposition of this litigation.

[2] *See U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 276 (2021) (Breyer, J., dissenting) (noting that "out of 6,829 formal consultations between 2008 and 2015, the Fish and Wildlife Service "issued a Final Biological Opinion finding jeopardy only *twice*") (cleaned up).

[3] "AR" citations in Defendants' Exhibit 2 refer to the administrative record prepared in *Nw. Envtl. Def. Ctr. v. Fed. Emergency Mgmt. Agency*, No. 3:23-cv-01335-SI (D. Or.).

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                    1

legally implemented. Disaster Recovery Reform Act of 2018, Pub. L. No. 115-254, §1246, 132 Stat. 3185 (2018).

Despite the five years FEMA had to implement interim measures, FEMA did not take action until after the Northwest Environmental Defense Center, Center for Biological Diversity, Willamette Riverkeeper, and The Conservation Angler ("Conservation Groups") filed suit in the District of Oregon alleging that FEMA has failed to timely implement the RPA and that the belated steps FEMA has taken to avoid jeopardy and adverse modification are inadequate. *See Nw. Envtl. Def. Ctr.*, No. 3:23-cv-01335-SI (D. Or.). Only subsequently, on July 15, 2024, did FEMA announce that that it would implement the Pre-Implementation Compliance Measures ("PICMs") which are the subject of Plaintiffs' Motion for Preliminary Injunction. While the PICMs are *not* the interim measures set forth in the RPA—for instance, the interim measures required by the RPA did not involve providing communities with several PICM options to choose from, did not rely on FEMA's interpretation of 44 C.F.R. § 60.3(a)(2) ("De Facto Amendment"), and did not require FEMA to place a moratorium on the processing of requests for Conditional Letter of Map Revisions ("CLOMRs") and Conditional Letters of Map Revisions Based On Fill ("CLOMR-Fs"),[4] *see* Biological Opinion at AR 288–290—they are more beneficial to the species than if FEMA were to do nothing at all pending full implementation of the RPA.

Plaintiffs now seek a preliminary injunction barring FEMA from implementing the PICMs, arguing that FEMA has violated the Administrative Procedure Act ("APA") and the

---

[4] A "conditional letter of map revision," or "CLOMR," does not itself revise the SFHA map but is an advisory letter from FEMA commenting on whether a proposed project that will encroach on the SFHA would meet the NFIP's criteria. When the project would involve fill, the advisory letter is called a "CLOMR-F." *See* Biological Opinion at AR 30 (defining LOMR-Fs, CLOMRs, and CLOMR-Fs).

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                                    2

National Environmental Policy Act ("NEPA"). But, contrary to Plaintiffs' assertions, FEMA does have the authority to implement measures for the protection of imperiled species, Plaintiffs have failed to demonstrate irreparable harm warranting the issuance of a preliminary injunction, and the public interest disfavors an injunction because of the harm that will result to endangered and threatened species. Conservation Groups also contest the broad scope of relief sought by Plaintiffs.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may *only* be awarded *upon a clear showing* that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council*, *Inc.*, 555 U.S. 7, 22 (2008) (emphasis added)). To obtain a preliminary injunction, it is Plaintiffs' burden to show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

## ARGUMENT

Conservation Groups contest Plaintiffs' assertion that "absent the De Facto Amendment, there would be no basis for FEMA to impose the PICMs," Pls.' Memo. in Supp. of Pls.' Mot. for Preliminary Inj. ("Pls.' Memo"), ECF 4-1 at 21–23, because—as every court that has ruled on this issue has found—the National Flood Insurance Act ("NFIA"), its implementing regulations, and the ESA confer the requisite authority for FEMA to take action to avoid the extinction and further the recovery of ESA-listed species that are adversely impacted by the NFIP. Further, Plaintiffs' claims of irreparable harm to their members are speculative, and Plaintiffs essentially ignore the strong public interest in protecting endangered and threatened species and reducing

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                    3

losses from floods, which disfavor Plaintiffs' request for a preliminary injunction. Finally, should this Court rule in favor of Plaintiffs, any injunction must be narrowly tailored to the specific harms alleged. Plaintiffs' requested relief, asking this Court to order FEMA to "halt its unlawful efforts to change the minimum floodplain development standards for participating in the [NFIP] in Oregon[,]" Pls.' Mot. for Prelim. Inj., ECF 4, goes well beyond harms related to FEMA's implementation of the PICMs set forth in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, ECF 4-1.[5]

I.    **FEMA Has the Authority Under the NFIA and ESA to Implement Measures, Including Those Required by the RPA, for the Benefit of Listed Species**

Conservation Groups take no position as to whether FEMA violated the APA when it adopted the PICMs without notice and comment, but Plaintiffs' contention that "no provision under the NFIA authorizes FEMA to adopt measures for the benefit of threatened and endangered species that extend beyond the primary purposes of the NFIA, which is avoidance of flood damage and flood losses," Pls.' Memo at 22, is simply wrong. As every court to have considered the issue has found, FEMA clearly has authority under the NFIA to act for the benefit of endangered and threatened species. *See Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1172–73 (W.D. Wash. 2004); *Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1240 (S.D. Fla. 1994); *Coal. for a Sustainable Delta v. FEMA*, 812 F. Supp. 2d 1089, 1122–23 (E.D. Cal. 2011); *Ecological Rights Found. v. Fed. Emergency Mgmt. Agency*, 384 F. Supp. 3d 1111, 1120–21 (N.D. Cal. 2019).

As an initial matter, a statute need not contain an explicit environmental purpose to trigger consultation under ESA Section 7(a)(2) or to implicate the duty to avoid jeopardy and the

---

[5] To avoid repetition, Conservation Groups took efforts to avoid raising points raised by Federal Defendants.

adverse modification of critical habitat. *See, e.g., Nat'l Wildlife Fed'n*, 345 F. Supp. 2d at 1172

(holding that the NFIP is subject to ESA consultation requirements and explaining that "an

environmental purpose need not be expressed in the enabling statute to trigger Section 7(a)(2) of

the ESA" because "most federal agency actions would not be subject to the formal consultation

process under Section 7(a)(2) if the ESA only applied to agency actions where the agency was

already compelled by statute to protect listed species"); *Fla. Key Deer v. Paulison*, 522 F.3d

1133, 1141 (11th Cir. 2008) (explaining that "there is no environmental-words test" when

determining whether Section 7 of the ESA applies to an agency's action). Rather, the ESA

applies if an agency has "some discretion to influence or change [its action] for the benefit of a

protected species." *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1021 (9th Cir.

2012); *Nat'l Ass'n of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 671 (2007) (holding that

"ESA's no-jeopardy mandate applies to every *discretionary* agency action—regardless of the

expense or burden its application might impose"). Thus, "in assessing statutory authority and

discretion with regard to ESA obligations, courts have found that if an agency has *any* statutory

discretion over the action in question, that agency has the authority, and thus the responsibility,

to comply with the ESA." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 251

(D.D.C. 2003) (emphasis added).

    And FEMA clearly has discretion within its implementation of the NFIP to take action

for the benefit of endangered and threatened species. *See, e.g.*, *Ecological Rights Found*, 384 F.

Supp. 3d at 1120 (noting that FEMA did not contest that it had discretion to take action for the

benefit of protected species). Specifically, under the NFIA, FEMA "shall … develop

comprehensive criteria designed to encourage, where necessary, the adoption of

adequate State and local measures which, *to the maximum extent feasible*, will—

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                    5

(1) *constrict the development of land which is exposed to flood damage* where appropriate,
(2) *guide the development of proposed construction away from locations which are threatened by flood hazards*,
(3) assist in reducing damage caused by floods, and
(4) *otherwise improve the long-range land management and use of flood-prone areas*."

42 U.S.C. § 4102(c) (emphasis added). This directive is in line with the overarching

purposes of the NFIP, which include "encourag[ing] State and local governments to make

appropriate land use adjustments to constrict the development of land which is exposed to flood

damage" and "guid[ing] the development of proposed future construction … away from

locations which are threatened by flood hazards." *Id*. § 4001(e). In 1994, the Federal Interagency

Floodplain Management Task Force stated that:

> If uncontrolled development and use of floodprone lands by unsuspecting or ill-informed people is allowed—we end up with unacceptable loss of life and property, and often irreparable harm to the natural functions of floodplains upon which we rely. Wise land use practices—delineation of sensitive areas, planning, management and restoration—are essential for allowing the continued use of valuable floodplain assets while at the same time safeguarding them against abuse.

Biological Opinion at AR 315–16.

Thus, contrary to Plaintiffs' myopic characterization of the NFIA in which Plaintiffs

quote only a fragment of 42 U.S.C. § 4102(c), Pls.' Memo at 22, FEMA has the authority to

enact measures that go beyond the protection of people and property. Indeed, as courts have

recognized, the NFIA's "purposes are broad and contemplate restriction of land development and

consideration of whether a locality's land-use measures will 'otherwise improve' land

management and use." *Fla. Key Deer*, 522 F.3d at 1142; *see also id*. at 1143 (noting that the

NFIP's implementing regulations, including 44 C.F.R. §§ 60.5(b)(2), 60.6(b)(1), 60.22(c)(2), and

60.25(b) require consideration of wildlife and environmental concerns); *see also* 42 U.S.C. §

4022(b) (directing FEMA to carry out a community rating system that "encourage[s] adoption of

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                                          6

more effective measures that protect natural and beneficial floodplain functions."). These statutory and regulatory provisions plainly grant FEMA the authority to implement the NFIP in an environmentally sound manner, which includes ensuring its actions do not harm endangered species and their habitat.

For decades FEMA's position was that the agency's implementation of the NFIP is a non-discretionary duty not subject to Section 7, but the agency has lost on this issue in every court that has heard it. *See, e.g.*, *Nat'l Wildlife Fed'n*, 345 F. Supp. 2d at 1172–74 (holding that the NFIP is subject to Section 7(a)(2) because the NFIA confers discretion on FEMA to implement the NFIP in a manner that would insure to the benefit of the listed species)*; see also Fla. Key Deer v. Stickney*, 864 F. Supp. at 1240 (finding "as a matter of law" that FEMA must comply with the ESA when implementing the NFIP); *Fla. Key Deer v. Paulison,* 522 F.3d at 1133, 1141–43; *Ecological Rights Found.*, 384 F. Supp. 3d at 1120–21. Tellingly, Plaintiffs make no attempt to refute the longstanding precedent affirming FEMA's statutory duty to implement the NFIP in a manner that does not harm ESA-listed species or their habitat.[6]

Further, many of the RPA elements that Plaintiffs argue FEMA has no authority to implement simply ask FEMA to follow the law. For example, despite the NFIA and its regulations requiring it to, FEMA has not mapped all of Oregon's Special Flood Hazard Areas— the area that has a 1-percent chance of being inundated by a flood event in any given year—

---

[6] *Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27 (D.C. Cir. 1992), the only case cited by Plaintiffs in support of their argument that the implementation of protective measures would be beyond the scope of FEMA's authority, is inapposite. That case involved the Federal Power Act's explicit requirement that annual hydropower licenses issued by the Federal Energy Regulatory Commission only be altered upon mutual agreement by the parties, which led the court to reject the conservation groups' argument that Section 7 of the ESA required the agency to unilaterally amend the terms of the license to include environmentally protective measures. *See id.* at 32–33. In other words, unlike here, the case involved a *non-discretionary* duty—FERC's duty to renew annual licenses without unilaterally amending those licenses—that was not subject to ESA Section 7's requirements.

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                    7

which determine where flood insurance is mandatory and where development criteria apply, has not mapped most floodways, and does not map non-coastal erosion zones. This is why RPA Element 3 simply calls on FEMA to "ensure that all special hazard areas … are fully and accurately reflected on FEMA's maps," because "incomplete, out of date, and/or inaccurate mapping of flood hazard prone areas prevents local government officials from understanding how severe flood risk is and thus from implementing restrictive zoning and land use regulations and comprehensive planning." Biological Opinion at AR 291; *see also* 42 U.S.C. § 4101(b) (directing FEMA to identify "risk zones within flood-prone and mudslide-prone areas"); 44 C.F.R. §§ 60.3, 60.5. As a result, "local officials in many flood-prone communities … like to think that a major flood is unlikely to happen to them[.]" Biological Opinion at AR 291. Accurate mapping thus will not only benefit local officials, but also "will provide valuable co-incidental information on, and protections for, floodplain functions and processes associated with important habitat features that support listed species." Biological Opinion at AR 291.

In sum, it is clear from the NFIA, its implementing regulations, and from every case that has ruled on the issue, that FEMA has the authority to implement measures to comply with its statutory duty under Section 7(a)(2) to ensure against jeopardy to the listed species and the destruction or adverse modification of their habitat. Thus, Plaintiffs' assertion that FEMA has no authority to adopt measures for the benefit of threatened and endangered species that extend beyond the primary purposes of the NFIA, which is avoidance of flood damage and flood losses, is patently wrong.

## II.    Plaintiffs' Claims of Irreparable Harm are Speculative and Non-Imminent

To obtain an injunction an applicant must demonstrated irreparable harm "of such imminence that there is a 'clear and present' need for equitable relief[.]" *Ashland Oil, Inc. v.*

*FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)). This is a

"considerable burden, requiring proof that the movant's injury is '*certain, great and actual*—not

theoretical—and *imminent*[.]'" *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204

(D.D.C. 2005) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The

failure to demonstrate such irreparable harm is "grounds for refusing to issue a preliminary

injunction, even if the other three factors entering the [preliminary injunction] calculus merit

such relief." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quotations

omitted).

     Here, however, at least some of Plaintiffs' alleged harms are only allegedly certain

because of Plaintiffs' own inaction. For instance, Plaintiffs insist that the PICMs force

communities to choose between compliance or violating "Oregon state and local laws and risk

litigation and legal penalties." Pls.' Memo at 31–32, Pls.' Reply in Supp. of Mot. for Prelim. Inj.

(Pls.' Reply"), ECF 18, at 21–23. But this harm is, at least in part, of their own making. For

instance, Plaintiffs allege that implementation of the PICMs, requiring the revision of their

floodplain development codes, would require a "Measure 56" written notice and specific

procedures that typically take six months or more to complete; a timeline longer than FEMA

allegedly gave them to come into compliance with the PICMs. *Id*. [7]

---

[7] ORS 215.503 and 227.186 are the notice statutes created by Measure 56 in 1998. These statutes require notice to property owners of any proposed legislative zoning amendment that could reduce their property values by limiting or prohibiting uses. ORS 215.503, 227.186. To comply with these statues, the governing body shall give written individual notice of land use change to be mailed to affected property owners "at least 20 days but not more than 40 days before the date of the first hearing on an ordinance." *See* ORS 215.503(3)–(4); ORS 227.186(3)–(4) (same). Given that communities had from July 15, 2024 to December 1, 2024 to merely pick which PICM they would pursue, they had ample time to comply with the Measure 56 notice mandates set forth in ORS 215.503 and 227.186.

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                      9

But absent from Plaintiffs' declaration is any statement that they have sought to issue these notices or undertake these procedures. Plaintiffs' members became aware of FEMA's intention to pursue the PICMs on July 15, 2024. Thus, they have had months to begin complying with Oregon's land use laws but have chosen not to. Even if the process does take six months, as Plaintiffs attest, their fear that they will be suspended from the NFIP by FEMA before they can come into compliance is not yet warranted as FEMA has stated that it takes "no less than six months" to do so and there is no evidence that FEMA has acted to suspend any of Plaintiffs' members from the NFIP at this point. Fed. Defs.' Memo. in Opp. to Pl's. Mot. for Prelim. Inj. ("Fed. Defs.' Memo"), ECF 13 at 41. Thus, even if they were to start the revision process today, it is likely that it could be completed prior to suspension from the NFIP. In such circumstances, when a movant has failed to take action, courts have found their "self-inflicted" harm cannot serve as the basis for showing irreparable harm. *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012). At the very least, such harm is not *irreparable* as Plaintiffs do not attest that they are unable to comply with Measure 56 or revise their floodplain development code, only that it will take time and effort.[8]

Plaintiffs also allege that implementation of the PICMs will "expose communities to Measure 49 damage claims[,]" citing to a memo prepared by the Oregon Department of Land

---

[8] Plaintiffs' claims of irreparable harm are further diminished by other affected governing bodies' ability to comply with the PICMs. For example, Springfield, Oregon adopted Resolution 2024-37 on December 2, 2024, codifying their adoption of FEMA's Model Ordinance. *See,* Springfield, Oregon: Floodplain PICM Code Amendments, available at: https://springfieldoregonspeaks.org/projects/floodplain-picm-code-amendments; *see also,* Springfield, Oregon, *Floodplain Management,* available at: https://springfield-or.gov/city/development-public-works/floodplain-management/. Lane County has also held multiple work sessions and executive sessions, ultimately determining that they would adopt a hybrid approach, implementing aspects of the Model Ordinance and the Permit-by-Permit pathways. *See* Lane County, *FEMA BiOp Pre-Implementation Compliance Measures, available at* https://www.lanecounty.org/government/county_departments/public_works/land_management _division/land_use_planning___zoning/fema_bi_op_pre_implementation_compliance_measures.

Conservation and Development ("DLCD") —the authority on compliance with Oregon's land use scheme. Pls.' Memo at 34. But the DLCD expressly stated that while "Measure 49 could apply in some situations, … it is unlikely that a city or county would have to pay compensation to a landowner." Pls.' Ex. G, ECF 4-9, DCLD, Frequently Asked Questions about Pre-Implementation Compliance Measures, at 8 ("DLCD FAQ"). At the very least, as the DLCD makes clear, such harms are speculative at this point, not certain, great, and actual, and Plaintiffs point to no concrete impending Measure 49 liability, but rather rely on the vague, unspecified possibility that property owners may seek compensation in the future. *See, e.g.*, Absher Dec. ¶ ¶ 31; Henrikson Decl. ¶ 26; Balensifer Decl. ¶ 21; Hinkelman Decl. ¶ 15 (repeating the conclusory statement, which lacks any substantive analysis of purported liability, that "[i]plementation of the PICM pathways also exposes the County to Measure 49 … damages claims").

Plaintiffs cite to *Morales v. Trans World Airlines, Inc.*, to support their argument of irreparable harm due to the risk of legal penalties, but the facts here are substantially different. 504 U.S. 374, 381 (1992). In that case, "the attorneys general of seven States, including petitioner's predecessor, had made clear that they would seek to enforce the challenged portions of the [measures at issue] through suits under their respective state laws" and at least one of these states "imposes additional liability … for multiple violations." *Id.* In stark contrast, here, the DLCD has explicitly stated that the agency "requires more than one instance of noncompliance to form either a pattern or practice of decision making that violates either an acknowledged comprehensive plan or land use regulation," and that, in any event, it "will not prioritize … enforcement related to a participating community's adoption of a PICM."[9] And with regard to

---

[9] DLCD, *FEMA-NFIP-PICM Requirements: State Agencies' Technical Response*, *available at* https://www.oregon.gov/lcd/NH/Documents/2024-12-DLCD_FEMA_NFIP_PICM_Requirement_One_Pager_Final.pdf

community suspension from the NFIP, "FEMA anticipates that most compliance issues will be resolved through technical assistance," Declaration of John Graves at ¶ 51, Defs.' Ex. 4, ECF 12-5, to which Plaintiffs offer no response.[10] Plaintiffs' "the sky is falling" narrative is therefore not supported by the caselaw or the record, as the prospect of a lawsuit "must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury," *Morales*, 504 U.S. at 374, 381, and Plaintiffs point to no evidence that this is so.

Plaintiffs also make several conclusory assertions that the PICMs are inconsistent with several provisions of Oregon land use law. Pls.' Memo at 35–37. But their only support for these assertions is to cite to their own declarations from individuals who work in local government, while the DLCD "has not yet determined whether the PICM Model Ordinance has only clear and objective standards." DLCD FAQ at 7. In other words, Plaintiffs' claims that the PICMs are inconsistent with Oregon land use law are speculative.[11] Thus, Plaintiffs have failed to show that they face a Hobson's choice between compliance with Oregon law and the PICMs. Rather, what they have shown is that they are not even attempting to come into compliance.

Plaintiffs also fail to show that their members will suffer irreparable harm with respect to landowners' ability to develop their properties in a business-as-usual manner. First, Plaintiffs' alleged harm stems from the requirement that their members will have to obtain permits and mitigate for environmental harms caused by their floodplain development projects, which will

---

[10] Moreover, Plaintiffs assert without any support that "on the other hand, if Oregon communities choose to comply with Oregon state and local law, they will then be out of compliance with the PICMs and on the path to suspension from the NFIP." Pls.' Memo at 34–35. But Plaintiffs do not explain how complying with state and local law will result in their members' suspension from the NFIP, particularly when the enforcement of those state and local laws is speculative. DLCD FAQ at 2.

[11] Plaintiffs' claims that the PICMs violate Oregon state law counsel in favor of transferring this case to the District of Oregon. *See* Conservation Groups' Memorandum in Support of Motion to Transfer at 14–15.

allegedly result in communities' diversion of resources and impose delay and additional costs on development plans. *See*. Pls.' Memo at 37–40, Pls.' Reply at 20. But "these type of ordinary compliance costs … do not rise to the level of irreparable harm." *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1047 (D. Mont. 2020) (citing *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019)).[12] This is especially true when weighing the lost revenues associated with a development project against the potential environmental harms that would result should the project be completed. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) (determining that the "loss of anticipated revenues … does not outweigh the potential irreparable damage to the environment").

Here, NMFS determined *nine years ago* that FEMA's status quo implementation of the NFIP in Oregon was jeopardizing the continued existence of seventeen ESA-listed species, and that untracked and unmitigated floodplain development continues to propel these species toward extinction. *See* Biological Opinion at AR 198 (NMFS expressing concern, in 2016, that any further loss of floodplain habitat function would likely delay or prevent the species' recovery). Plaintiffs' members have been aware since the Biological Opinion was released in 2016 that reforms to floodplain regulation were coming, and that communities with a significant amount of land in the floodplain, such as Tillamook and Warrenton, may be best served by developing a Habitat Conservation Plan or developing an alternative compliance scheme through consultation with NMFS, Biological Opinion at AR 302–303.[13] But, rather than take action to bring their local

---

[12] And as Federal Defendants address in their response, Defs.' Br. at 39–40 , "in the District of Columbia Circuit, it is well settled that economic loss does not, in and of itself, constitute irreparable harm." *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 38.

[13] *See also* NOAA, Technical Guidance: Oregon RPA for Floodplain Protection, 2017 (explaining that "the RPA allows communities, in coordination with FEMA and NOAA Fisheries, to develop individualized compliance plans where the RPA's recommended measures

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                    13

land use codes into compliance with the Biological Opinion, these communities—unlike others subject to the RPA—opted instead to focus their resources on opposing the few measures FEMA has attempted to implement. In short, Plaintiffs here "possess no inherent right to maximize revenues by using a cheaper, quicker permitting process, particularly when their preferred process does not comply with the ESA." *N. Plains Res. Council*, 460 F. Supp. 3d at 1047.

Moreover, Plaintiffs' claims of impacts to proposed projects are speculative and conclusory. For instance, Plaintiffs point to a senior housing development project that would include putting residents in the Special Flood Hazard Area and insist that the PICMs would render the project "financially infeasible." Pls.' Memo at 38–40. But Plaintiffs mischaracterize the cited Watson Declaration, which states only that a "preliminary review" has been conducted as to how the PICMs would impact the development, and that the feasibility of the project "is still under evaluation." Watson Decl. at ¶ 25. Further, the Absher Declaration—which Plaintiffs cite to for the proposition that it is not financially feasible for *any* owners of farmland to comply with the PICMs—offers only a conclusory assertion to this effect that is void of support. *See* Absher Declaration at ¶ 46.[14] Additionally, the fact that economic losses may be unrecoverable, Pls.' Memo at 40–41, "does not absolve [Plaintiffs] from [their] 'considerable burden' of proving that those losses are '*certain, great and actual*.'" *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (emphasis added) (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C.

---

would be impracticable—for example, in jurisdictions located entirely within the floodplain, such as Enterprise or Tillamook"). *Available at*: https://media.fisheries.noaa.gov/2022-02/techguidance-oregon-rpa-for-floodplain-protection.pdf . Accessed Feb. 18, 2025.

[14] The Absher Declaration mentions several other projects that are purportedly infeasible due to the PICMs, including a proposed aircraft landing to improve safety, drainage repairs, installation of new water lines, and a new sewer lift station. Absher Decl. at ¶ 50. The declaration does not address whether the numerous exemptions from the no net loss standard contained in the PICMs may apply to such projects, *see* Exhibit B at 3-32 to 3-33, and the assertions as to their infeasibility are theoretical and conclusory.

2005). In short, Plaintiffs here are "offering nothing more than predictions that are at best, remote and speculative" and "accordingly, there is no 'clear and present need for extraordinary equitable relief to prevent harm.'" *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (quotations omitted).

Plaintiffs also claim that the temporary, interim requirements imposed by the PICMs irreparably harm Plaintiffs' members because their implementation "threaten[s] the essential character of NFIP-participating communities and their land use priorities[.]" Pls.' Memo at 41–42, Pls.' Reply at 19. But this is also speculative. First, as the DLCD FAQ emphasizes, the changes imposed by the PICMs are "short term." DLCD FAQ at 2. Plaintiffs point to no case that supports their contention that temporary, uncertain impacts to the participating communities' "essential character" warrants the extraordinary relief of an injunction.[15] Second, communities themselves have the opportunity to create exemptions from the PICMs' "no net loss" standard when updating their land use regulations. As DLCD explains, several activities, including those for habitat restoration or routine agricultural practices, are already exempt from much of the PICMs' requirements and "a city or county [that] may not want to completely prohibit all development in the floodplain … may want to think about explicitly adding in [additional] activities exempt from the no net loss standards as listed in section 6.3 of the PICM Model Ordinance." *Id*. at 6. In short, Plaintiffs' contention that the temporary PICMs will irreversibly alter the "character" of the participating communities is theoretical.

---

[15] The only case Plaintiffs do cite to in this portion of their reply is a concurrence opinion in *Brendale v. Confederated Tribes*, 492 U.S. 408, 434–44 (1989), Pls.' Reply, ECF 18 at 19, which addresses a Tribe's "virtually absolute power" to exclude nonmembers from its sovereign territories to protect the character of its Tribal community and how the power to regulate the land at issue "ran parallel to the power to exclude." 492 U.S. 408, 433, 435 (1989). Here, Plaintiffs are not sovereign Tribes with "virtually absolute power" over their land but are instead concerned with the interests of property owners living in communities that *voluntarily* participate in the NFIP to receive tax-payer subsidized, low-cost flood insurance.

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                             15

Plaintiffs also assert that the implementation of the PICMs will doom communities'
population growth objectives and "drive needed development out of Clatskanie, leaving the City
with no options to maintain and expand itself." Decl. of Gregory Hinkelman at ¶ 26, ECF 4-22.
But Plaintiffs provide no support for these assertions nor any explanation as to how the
temporary, short-term interim measures that allow for flexibility in their application would, over
time, drive development out of the city—a result which, by its very nature, cannot be imminent.

In D.D.C., plaintiffs must overcome a "very high bar" to establish irreparable harm, and
"injunctive relief will not be granted against something merely feared as liable to occur at some
indefinite time." *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 540 F. Supp.
3d 45, 56 (D.D.C. 2021) (cleaned up). Because alleged harm to Plaintiffs' members is
conclusory, speculative, and non-imminent, it cannot satisfy the test for irreparable harm and this
Court should not issue an injunction on the PICMs.

## III.    The Public Interest in Protecting Endangered Species and in Preventing Flood Losses Weighs in Favor of Denying Plaintiffs' Motion for Preliminary Injunction

In cases such as this, where a preliminary injunction is sought against the government,
the third and fourth factors governing the issuance of a preliminary injunction—the balance of
equities and whether an injunction is in the public interest—merge and the Court weighs "the
benefits to the private party from obtaining an injunction against the harms to the government
and the public from being enjoined." *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019). In cases
involving ESA-listed species, however, Congress's enactment of the ESA makes "abundantly
clear" that the conservation of endangered species is of the "highest of priorit[y]." *Am. Rivers*,
271 F. Supp. 2d at 261; *see also, e.g.*, *Conservation Law Found. v. Ross*, 422 F. Supp. 3d 12, 34
(D.D.C. 2019) (declaring that the "public interest in preventing the extinction" of imperiled
species "is beyond dispute"); *see also NRDC v. Evans*, 364 F. Supp. 2d 1083, 1141 (N.D. Cal.

2003) (recognizing that the public has an "extremely strong" interest in protecting "the survival and flourishing of marine mammals and endangered species[.]").

Despite this clear caselaw heavily favoring endangered and threatened species, Plaintiffs essentially ignore the impact enjoining the PICMs will have on endangered species, stating only on reply that "[t]he fact that this case implicates ESA-listed species does not trump the greater public interest in ensuring that federal agencies follow the law." Pls.' Reply at 23. But the impact to Oregon's listed salmonid species, Pacific eulachon, and Southern Resident killer whales is severe.

Since the Biological Opinion was issued, they remain at grave risk of extinction and continue to be harmed by FEMA's implementation of the NFIP in Oregon. As explained in Conservation Groups' Motion to Intervene, several of NMFS's most recent 5-year status reviews for these species indicate that they either remained at the same high risk of extinction as when the 2016 Biological Opinion was produced, or are currently at greater risk of extinction and that FEMA's failure to implement the RPA in Oregon is contributing to these species' decline. *See* Mot. to Intervene, ECF 9, at 14–16 (detailing NMFS's 5-year status reviews noting that ongoing development, without mitigation, is contributing to these species decline and recommending that FEMA implement changes to the NFIP that minimize and mitigate the impacts from floodplain development).

These species, which are jeopardized by a status quo approach to the implementation of the NFIP in Oregon by FEMA, are also highly cherished in Oregon for their ecological and cultural significance, including by Conservation Groups' own members. *See generally* Declaration of Michelle Emmons, ECF 9-5, Declaration of Jesse Buss, ECF 9-4, and Declaration of Noah Greenwald Decl., ECF 9-6. For instance, Ms. Emmons, a member of Willamette

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                    17

Riverkeeper, is irreparably harmed by the ongoing decline of the salmonids because the rural Oregon community in which she lives is dependent on river recreation. Emmons Decl. ¶¶ 8–9. An angler and photographer who recreates nearly every day via flyfishing, hiking, or paddling in the impacted watersheds, her recreational and aesthetic interests in the species are likewise irreparably harmed by the species' failure to recover, which the NFIP contributes to. *Id.* ¶ 9. This harm would be at least partially redressed if FEMA implements protective interim measures pending full RPA implementation. *Id.*; *see also* Buss Decl., ¶¶ 4–10, and Greenwald Decl., ¶¶ 1, 5–11.[16]

Plaintiffs' assertion that there is a "greater public interest in ensuring that federal agencies follow the law[,]" Pls.' Reply at 23, fails to address these very real harms. That there is a significant public interest in federal agencies following the law boarders on a truism. But FEMA's actions here are in pursuit of its compliance with the ESA and if FEMA is prevented from implementing the PICMs, the agency will deepen its ongoing violation of Section 7 of the ESA. Plaintiffs offer no insight into how this Court should weigh competing legal priorities, but given that environmental harm, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987), an injunction that causes FEMA to abandon its implementation of the RPA and to perpetuate the agency's ongoing jeopardization of the species in violation of Section 7 of the ESA would not be in the public interest.

---

[16] Admittedly, in their ongoing litigation in the District of Oregon, Conservation Groups assert that the PICMs do not go far enough to adequately protect endangered and threatened species and their critical habitat. But they are better than the status quo which NMFS has found jeopardizes their very survival while FEMA's implementation of the RPA goes through a lengthy NEPA process. *See* Biological Opinion at AR 312 (explaining that interim measures are necessary to protect habitat until the more protective requirements of the long-term changes to the NFIP can be put in place).

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                    18

Plaintiffs also fail to address how a preliminary injunction may impact the public interest in preserving floodplain function and reducing losses of life and property to floods. Floodplains are low-lying areas adjacent to rivers, streams, and coasts that become inundated during storm and snowmelt events.[17] They are essential to the landscape's ability to cope with extreme weather, for instance by absorbing excess flood water and providing groundwater recharge during periods of drought. Biological Opinion at AR 41, 149. If implemented, the PICMs would not only benefit species and their habitat but would also benefit communities at risk of flooding because it "would limit future construction in areas exposed to flooding, as well as decrease over time the number of structures vulnerable to flood losses, thereby reducing federal flood expenditures." Biological Opinion at AR 314.

As FEMA has declared, "avoidance of development in high hazard areas is the preferred approach for minimizing losses to people, property, and natural floodplain values." *Id*. at AR 315. Unfortunately, many communities continue to develop in areas at high-risk of flooding, "lik[ing] to think that a major flood is unlikely to happen to them," *id.* at AR 291, often placing society's most vulnerable people in harm's way. While the PICMs represent only a portion of what the RPA's interim measures require, they would encourage responsible floodplain development and reduce the risk of life and property losses pending full RPA implementation. *See* Declaration of John Graves at ¶ 33, ECF 12-5.

Moreover, because the low-cost flood insurance provided to those living in high-risk areas is funded by taxpayer dollars, the public has a strong interest in ensuring those taxpayer dollars are not supporting a program that worsens flood events when they do occur, which the

---

[17] National Oceanic and Atmospheric Administration, U.S. Dept. of Commerce, Oregon Floodplains: Working to Conserve Pacific Salmon & Local Communities 1–2 (2016). Accessed July 14, 2024. Available at: https://media.fisheries.noaa.gov/2022-02/oregon-fema-Biological Opinion-factsheet-2016 ("NMFS 2016").

NFIP as implemented in Oregon has been found to do. *See, e.g.,* Biological Opinion at AR 174–78. Heightening the taxpayer's interest, the NFIP's annual financial losses are significant and are increasing as the frequency of severe storms increases with climate change. For instance, in 2014 the program lost $380 million, and in 2017, the program lost over $10 billion. Federal Emergency Management Agency, *NFIP Debt*, Tools for Practitioners (Nov. 4, 2022).[18] Currently, the NFIP is more than $20 billion in debt, and in 2022, American taxpayers paid over $280 million in interest on that debt alone. *Id.* Accordingly, an injunction that precludes FEMA from making changes to the NFIP that would reduce flood losses and therefore taxpayer expenditures is not in the public interest. *See WP Co. LLC v. United States SBA*, Civil Action No. 20-1240 (JEB), 2020 WL 6887623, at *4 (D.D.C. Nov. 24, 2020) (emphasizing the public interest in ensuring government actions do not "threaten taxpayer dollars").

   As such, when weighing the balance of equities and the public interest, this Court must take into account the strong public interest in FEMA's implementation of measures designed to reduce harm to ESA-listed species and limit the exposure of people and property to flood hazards. Consequently, the balance of equities favors denying Plaintiffs' Motion.

## IV.    Any Preliminary Injunction Issued by This Court Must be Narrowly Tailored

   If this Court were to grant Plaintiffs' Motion, any injunction must still "be narrowly tailored to remedy the specific harm shown." *Neb. Dep't of Health & Human Servs. v. Dep't of Health and Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006). The need for a narrowly tailored injunction "is particularly important in the context of a preliminary injunction or temporary restraining order, where the court has yet finally to resolve the merits of the dispute." *U.S. Ass'n of Reptile Keepers*, 106 F. Supp. 3d at 126.

---

[18] *Available at* https://www.fema.gov/case-study/nfip-debt.

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                   20

Yet, Plaintiffs have been vague in the relief they are requesting, with broad relief requested in their Motion and more tailored relief requested in their Memorandum in Support. Specifically, in their Memorandum in Support, Plaintiffs request that this Court "enter a preliminary injunction barring Defendants from implementing or enforcing the PICMs and De Facto Amendment pending resolution of this case." Pls.' Memo at 45. In contrast, Plaintiffs' Motion asks this Court to "halt [FEMA's] unlawful efforts to change the minimum floodplain development standards for participation in the [NFIP] in Oregon in response to Defendant [NMFS's] flawed Biological Opinion." Pls.' Mot. for Prelim. Inj. at 1. This latter request is significantly broader in scope, arguably halting all of FEMA's efforts to come into compliance with the ESA and not just their issuance of the PICMs. As such, it would be inappropriate for this Court to issue, especially considering that Plaintiffs do not argue in their Memorandum in Support that they are likely to succeed on the merits of their ESA claims challenging the lawfulness of the Biological Opinion at the center of this case. Therefore, any order enjoining Defendants from implementing or enforcing the PICMs must not interfere with FEMA's ability to continue its efforts to halt its ongoing jeopardization of the endangered and threatened species impacted by their implementation of the NFIP in Oregon and the destruction or adverse modification of their critical habitat. *See* Biological Opinion at AR 281–82.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for preliminary injunction.

Dated: February 21, 2025                    Respectfully submitted,


                                            */s/ Chelsea Stewart-Fusek*
                                            Chelsea Stewart-Fusek
                                            (D.C. Bar No. OR0029)

DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION                                          21

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Phone: (971) 717-6425
Email: cstewartfusek@biologicaldiversity.org

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon (D.C. Bar No. OR 0007)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
T: 503.283.5475 ext. 407
F: 503.283.5528
E: rshannon@biologicaldiversity.org

*Counsel for Northwest Environmental Defense
Center, Center for Biological Diversity, The
Conservation Angler, and Willamette Riverkeeper*