**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OREGONIANS FOR FLOODPLAIN PROTECTION, *et al.*, <br><br> Plaintiffs, <br> v. <br><br> U.S. DEPARTMENT OF COMMERCE, *et al.*, <br><br> Defendants, <br> and <br><br> NORTHWEST ENVIRONMENTAL DEFENSE CENTER, *et al.*, <br><br> Defendant-Intervenors. | Case No. 25-cv-39 (JMC) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Oregonians for Floodplain Protection (OFP) and National Association of Home Builders of the United States (NAHB) (together, "Plaintiffs") bring a set of statutory and constitutional challenges to decisions of the Federal Emergency Management Agency (FEMA), a component of the U.S. Department of Homeland Security (DHS), and the National Marine Fisheries Service (NMFS), a component of the U.S. Department of Commerce (together with their top officials, "Federal Defendants"), regarding risks to endangered species in the Oregon floodplain. They seek preliminary and permanent injunctive relief prohibiting FEMA from continuing to implement its plan to bring its National Flood Insurance Program (NFIP) in Oregon into compliance with the Endangered Species Act (ESA) and the NMFS's "Biological Opinion" because of the plan's alleged legal deficiencies. Meanwhile, four environmental conservation groups, Defendant-Intervenors, seek to transfer this suit to the District of Oregon, where they

previously filed a still-pending suit that aims to compel FEMA to implement that same Biological Opinion more completely and expeditiously than they allege FEMA currently is. Both Plaintiffs and Federal Defendants here object to transfer, preferring to litigate this case in this Court while Defendant-Intervenors' case proceeds in Oregon.

The Court agrees with Defendant-Intervenors that transfer is warranted. Although this case and the Oregon case do not involve the same claims, they both challenge the same agency decisions and involve almost all the same parties. Further, failure to transfer would present a high risk of inconsistent—indeed, entirely incompatible—judgments. Put simply, Defendant-Intervenors' suit in Oregon "seek[s] to compel implementation" of the Biological Opinion, while Plaintiffs here "seek to enjoin further implementation." ECF 32 at 7.[1] If the plaintiffs in each of the two cases were to prevail, the agency could not comply with both decisions. That risk counsels strongly in favor of transfer. And because none of the other factors that this Court must consider under 28 U.S.C. § 1404(a) weigh heavily enough against transfer to overcome that risk, the Court will **GRANT** Defendant-Intervenors' motion to transfer this case to the District of Oregon.

## I.     BACKGROUND

The story of this case dates back at least to June of 2009, when a group of environmental conservation groups that includes one of the Defendant-Intervenors here, the Northwest Environmental Defense Center (NEDC), sued FEMA challenging its failure to consult NMFS about the impact on endangered species of its NFIP for Oregon's floodplain, pursuant to requirements of the ESA. ECF 4-1 at 18. The NFIP is a FEMA-administered program that "enables

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

property owners in participating communities to purchase insurance protection against losses from flooding through the federal government, provided that their participating communities adopt certain floodplain management regulations." ECF 21 ¶ 34 (citing 42 U.S.C. § 4001 *et seq.*). About a year later, in 2010, the parties settled after FEMA agreed to initiate an ESA consultation regarding the impact of Oregon's NFIP on certain endangered species. ECF 4-1 at 18–19.

That process led to NMFS's 2016 issuance of a Biological Opinion. *Id.* at 19. The Biological Opinion included a determination by NMFS that implementing FEMA's proposed NFIP in Oregon would "jeopardize the survival and recovery of" 16 anadromous fish species and a species of killer whales, and would also "destroy or adversely modify" the 16 fish species' designated or proposed critical habitat. *Id.* Based on those findings, the NMFS issued a "reasonable and prudent alternative" (RPA), which included six "element[s]" for FEMA to implement to bring its Oregon NFIP into compliance with the ESA. *Id.* at 11, 19–20.

FEMA implemented RPA Element 1 in June of 2016 when it notified Oregon's NFIP-participating communities of the Biological Opinion's conclusions and the RPA's terms. *Id.* at 20. Then, in 2017, Plaintiffs (along with another organization) sued in this District challenging the Biological Opinion and FEMA's implementation of the RPA. *Id.* at 21; *see OFP v. U.S. Dep't of Com.*, No. 17-cv-1179 (RJL) (D.D.C.) ("*Oregonians I*"). In 2018, Judge Leon dismissed that case for lack of subject matter jurisdiction, holding that the plaintiffs lacked standing and that their claims were not ripe because FEMA had not yet implemented any "final agency action." *Oregonians I*, 334 F. Supp. 3d 66, 72–74 (D.D.C. 2018).

In the years since, FEMA has continued to work toward implementation of the remaining elements of the RPA (though at a pace and with a degree of completeness that the Parties here and in Oregon debate). In September 2023, dissatisfied with FEMA's progress, Defendant-Intervenors

here sued FEMA and DHS in the District of Oregon. *See NEDC v. FEMA*, No. 3:23-cv-1335-SI (D. Or.) ("*NEDC*"). They alleged that FEMA "ha[d] taken no meaningful actions to complete the work mandated in the [Biological Opinion]" and that the 17 endangered species faced continued harm as a result. *NEDC*, ECF 1 ¶ 8 (D. Or. Sept. 14, 2023). And they sought declaratory and injunctive relief that would compel "FEMA's compliance with Section 7 of the ESA" through timely implementation of the RPA or equivalent measures. *Id.* ¶ 9.

About two months after Defendant-Intervenors filed their Oregon suit, in November 2023, FEMA reconsidered its prior position against implementing certain interim ESA compliance measures and decided to move forward with implementation of interim measures consistent with RPA Element 2. ECF 4-1 at 23–24. Accordingly, in July 2024, FEMA announced to Oregon's NFIP-participating communities the set of interim measures with which they would have to comply pursuant to the Biological Opinion. *Id.* at 24. The announcement gave participating communities three options from which they could choose in order to comply. *Id.* FEMA declared that those communities would have to make their compliance choice by December 1, 2024, begin collecting data on their compliance by January 31, 2025, and begin reporting such data to FEMA in January 2026. *Id.*

In September 2024, the plaintiffs and the defendants in the Oregon case (essentially the same entities as Defendant-Intervenors and Defendants here, respectively) both filed motions for summary judgment in that case, which are fully briefed as of November 2024. *See NEDC*, ECF 31 (Nov. 19, 2024). In addition, Plaintiff OFP here filed an *amicus curiae* brief in the Oregon case in which it asked that court to delay ruling on those plaintiffs' (i.e., Defendant-Intervenors') motion for summary judgment because they sought relief "that FEMA is incapable of effectuating by law."

*NEDC*, ECF 28 at 13 (Sept. 27, 2024). OFP's amicus brief made many of the same legal arguments against the Biological Opinion and its implementation that Plaintiffs make here.

Yet, not content to remain just friends, OFP filed its own suit in this Court on January 6, 2025. ECF 1.[2] OFP (later joined by NAHB) alleges that FEMA's implementation of the Biological Opinion violates the Administrative Procedure Act (APA), the Constitution's Spending Clause, and the Tenth Amendment, ECF 21 ¶¶ 8–9, and they seek declaratory and injunctive relief preventing further implementation of the RPA and FEMA's other interim measures, *id*. at 47. On January 7, 2025, OFP also filed a motion for preliminary injunction to require FEMA to halt its ongoing implementation of the interim measures during this litigation. ECF 4. Meanwhile, Defendant-Intervenors successfully moved to intervene in this suit, *see* ECF 9; Feb. 10, 2025 Min. Order, and both Federal Defendants and Defendant-Intervenors opposed Plaintiffs' motion for preliminary injunction, ECF 13; ECF 27.

During the course of that PI briefing, which recently concluded, Defendant-Intervenors moved to transfer this case to the District of Oregon under 28 U.S.C. § 1404(a). ECF 26. Plaintiffs and Federal Defendants both oppose transfer. ECF 29; ECF 30. That motion was fully briefed as of March 10, 2025. Meanwhile, Judge Simon of the District of Oregon will hear oral argument on the pending motions for summary judgment in the Oregon case on March 18, 2025 (the day after this opinion's release). *See NEDC*, ECF 33 (Dec. 31, 2024).

## II.    LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). Section 1404 provides the Court with a mechanism to transfer a case, even

---

[2] NAHB joined this suit as a plaintiff on February 12, 2025. *See* ECF 21.

in cases where venue is proper in the transferor court, in order "to prevent the waste of time, energy and money[,] and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

Courts employ a two-step analysis to determine whether a case should be transferred. First, the court determines if the case could have been brought in the transferee district. *See S. Utah Wilderness All. v. Lewis*, 845 F. Supp. 2d 231, 234 (D.D.C. 2012). If so, the court turns to an analysis of the public and private interests supporting transfer. *See id.* The public-interest factors include: (1) "the transferee's familiarity with the governing laws" and the pendency of related litigation; (2) "the local interest in having local controversies decided at home," and (3) "the relative congestion of the calendars of the transferor and transferee courts." *Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 54 (D.D.C. 2012); *Nat'l Parks Conservation Ass'n v. Zinke*, No. 18-cv-753, 2018 WL 9650176, at *1 (D.D.C. July 25, 2018).[3] The private-interest factors include: "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof." *Id.*

The presence of a related case "weigh[s] heavily in favor of transfer," *Cal. Farm Bureau Fed'n v. Badgley*, No. 02-cv-2328, 2005 WL 1532718, at *2 (D.D.C. June 29, 2005), and it should be given "great weight" and "may be decisive . . . even though the convenience of the parties and witnesses point in a different direction," *id.* (quoting, in part, 15 Fed. Prac. & Proc. Juris. § 3854

---

[3] Some courts refer to the "pendency of related litigation" as an "additional consideration" rather than as a part of this first factor, but that distinction does not make a difference to the analysis. *Compare Holland v. A.T. Massey Coal*, 360 F. Supp. 2d 72, 76 (D.D.C. 2004) (referring to the consideration of "ongoing related litigation in another jurisdiction" as being "in addition to" the three main considerations), *with Bluetriton Brands*, *Inc. v. U.S. Forest Serv.*, No. 24-cv-2302, 2024 WL 5453421, at *3 (D.D.C. Oct. 23, 2024) (referring to this first factor as "the transferee court's familiarity with the governing laws and the pendency of related actions"), *and Nat'l Parks Conservation Ass'n*, 2018 WL 9650176, at *1 (same).

(4th ed.)); *see Wilderness Soc. v. Babbitt*, 104 F. Supp. 2d 10, 16 (D.D.C. 2000). District courts have broad discretion to decide whether to transfer, and the decision turns on an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622). Finally, the movant bears the burden of demonstrating that transfer is appropriate. *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996).

## III.    ANALYSIS

At the first step, the Parties agree that this suit could have been brought originally in the District of Oregon, ECF 26-1 at 12 (Defendant-Intervenors); ECF 29 at 5 (Federal Defendants); ECF 30 at 6 (Plaintiffs), and the Court agrees. The Court therefore moves to the second step of the transfer analysis: weighing the public- and private-interest factors for and against transferring the case. Taken together, those factors militate in favor of transfer.

### A.  The public-interest factors weigh heavily in favor of transfer

Of the public-interest factors, the first one—familiarity with governing law and the pendency of related litigation—points strongly toward transfer. In particular, the presence of ongoing, earlier-filed related litigation in the District of Oregon "weigh[s] heavily in favor of transfer." *Badgley*, 2005 WL 1532718, at *2. In this Circuit, "[w]hen lawsuits involving the same controversy are filed in more than one jurisdiction, the general rule is that the court that first acquired jurisdiction has priority." *Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11, 13 (D.D.C. 2001); *see also Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980) (stating this rule and explaining that "[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously"). The purposes of this rule include avoiding "waste[] of time, energy and money" from litigating similar claims in multiple jurisdictions, duplicative "discovery, motions practice,

and trial," and "inconsistent orders subjecting [the defendant] to inconsistent obligations." *Badgley*, 2005 WL 1532718, at *2.

Accordingly, courts in this district have often transferred later-filed cases involving the same factual or legal issues to the jurisdiction of the earlier-filed case. *See, e.g.*, *Biochem Pharma*, 148 F. Supp. 2d 11; *FTC. v. Cephalon, Inc.*, 551 F. Supp. 2d 21 (D.D.C. 2008); *Bluetriton Brands*, 2024 WL 5453421. Transfer may be particularly appropriate where the earlier-filed case has already proceeded through significant litigation, there is a "fully briefed" dispositive motion "awaiting resolution in that forum," and the court has "familiarity with these facts—and the law as applied to these facts." *Cephalon*, 551 F. Supp. 2d at 30–31. Critically, the related "[c]ases need not be identical to favor transfer," and they need not have the exact same parties or claims. *Bluetriton Brands*, 2024 WL 5453421, at *3; *see S. Utah Wilderness Ass'n v. Norton*, 315 F. Supp. 2d 82, 89 (D.D.C. 2004).

Plaintiffs' suit in this court is closely related to the suit brought in 2023 in the District of Oregon by Defendant-Intervenors against FEMA, FEMA's Acting Director, and DHS. *See NEDC*, No. 3:23-cv-1335-SI (D. Or.). First, essentially all the same parties (besides one of the Plaintiffs and a few of the Federal Defendants here) have appeared in that other litigation, either as parties or as amici. Second, the suits both challenge aspects of FEMA's implementation of the same RPA required under the same Biological Opinion that concerns the same floodplain and the same endangered species. Third, Plaintiffs here challenge the very actions that FEMA is taking to comply with the requirements that the Oregon plaintiffs accuse them of disregarding. Most notably, FEMA agreed in November 2023, two months after Defendant-Intervenors filed suit in Oregon, to reverse its prior position and begin implementing interim measures in accordance with RPA Element 2 of the Biological Opinion. ECF 4-1 at 23; *NEDC*, ECF 21-1 at 33–34. The

Government's implementation of RPA Element 2 is a central component of the Government's argument in its motion for summary judgment in the District of Oregon that it is in fact complying with the ESA and not jeopardizing the endangered species as alleged by Defendant-Intervenors. *See NEDC*, ECF 21 at 2; *NEDC*, ECF 21-1 at 41–46. But Plaintiffs here challenge, and have moved to preliminarily enjoin, exactly those actions by FEMA in implementing RPA Element 2. *See* ECF 4-1 at 23–24.

Indeed, this case has ping-ponged between the District of Oregon and this Court for nearly 16 years, starting in Oregon. Plaintiffs here describe the issues in this case as deriving from a 2009 lawsuit brought by one of the Defendant-Intervenors in the District of Oregon, which led (as part of the settlement to that litigation) the Government to conduct a review under the ESA and publish the Biological Opinion to begin with. *See* ECF 4-1 at 18–19. Later, after the Biological Opinion came out, Plaintiffs here sued in this District to challenge the validity of the Biological Opinion, making many of the same claims they make here, only to lose on standing and ripeness. *Oregonians I*, 334 F. Supp. 3d at 72–73. After that case terminated, the agency delayed further implementation of any interim measures. Eventually, Defendant-Intervenors sued in the District of Oregon (again) to compel agency action on the Biological Opinion, apparently spurring the agency into action. All told, these issues have bounced back and forth between the coasts for nearly two decades. But only now are there two active litigations at the same time.

Plaintiffs and Federal Defendants respond that the cases are, in fact, not closely related because the Oregon plaintiffs and Plaintiffs here bring different claims. ECF 29 at 8; ECF 30 at 18. That is true. But both sets of plaintiffs challenge the same agency actions, albeit on different grounds. And that overlap raises a significant risk of inconsistent judgments, which is one of the key considerations warranting transfer. The Oregon plaintiffs (Defendant-Intervenors here) seek

to compel the agency to, without further delay, implement the Biological Opinion or otherwise comply with the ESA. *See NEDC*, ECF 1 ¶ 9. By contrast, Plaintiffs here ask this Court to declare the Biological Opinion's RPA unlawful, preliminarily enjoin ongoing implementation of RPA Element 2, and either declare that FEMA does not have the authority to impose development requirements mandated by the ESA or, at minimum, require a further environmental review before any implementation of the interim measures can continues. *See* ECF 21 ¶ 7. If both this Court and the District of Oregon were to grant the relief sought, the agency would face an injunction to immediately implement the RPA and another preventing it from doing so. It could not possibly comply with both.[4]

Plaintiffs also argue that this Court may render a decision on Plaintiffs' motion for preliminary injunction, and potentially the merits of Plaintiffs' case, before the District of Oregon rules on Defendant-Intervenors' motion for summary judgment—and that the Oregon court could take any of this Court's rulings into account in its own rulings. ECF 30 at 18 First off, a plaintiff could make such a proposal any time there is related litigation pending elsewhere. If such strategic sequencing could obviate the problem, the inconsistent-judgment consideration would be rendered nugatory. Moreover, even if one district court chose to defer to the other and avoid inconsistent rulings (which they would have no particular obligation to do, as neither is bound by the other's decisions), that would still not address the waste of time and judicial resources resulting from one court having to potentially re-draft an opinion in response to another's order—after already having

---

[4] Notably, such a conflict would be even more pronounced than one that might arise in a typical set of APA challenges in which multiple plaintiffs subject to, say, a newly promulgated rule challenge enforcement of that rule in multiple courts. If one court declared enforcement of the rule against one plaintiff to be invalid and the other did not, the agency would not be subject to conflicting judgments (and depending on the scope of any injunction could decide whether or not to continue enforcing against the losing plaintiff even as it stopped enforcing against the winning one). Here, however, the two sets of plaintiffs take necessarily conflicting positions on the agency action, and there is an obvious risk of not just inconsistent but irreconcilable judgments.

received briefing and heard argument in its own case. It would be much more efficient for the same court to hear both sets of arguments and determine on its own how best to decide all of them, as the transfer caselaw recognizes.[5]

That first factor of the public-interest inquiry also asks about familiarity with governing law. This component does not weigh in either direction. On one hand, the District of Oregon is presumed to have greater familiarity with the issues of Oregon state law that some of Plaintiffs' claims implicate. *See* ECF 21 ¶ 94; ECF 4-1 at 42–47. On the other, this District typically receives more APA cases, although all federal courts are equally competent to interpret federal statutes. *See Stewart v. Azar*, 308 F. Supp. 3d 239, 248 (D.D.C. 2018); *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006). Because this consideration is neutral, the first factor still weighs strongly in favor of transfer overall.

The second factor of the public-interest analysis—the local interest in having local controversies decided at home—also weighs toward transfer. This case concerns land use restrictions *in Oregon* arising from a Biological Opinion regarding floodplain management *in Oregon* and affecting communities *in Oregon*. *See, e.g.*, ECF 21 ¶¶ 2–3, ECF 4 at 1. And claims of ongoing irreparable harm to *Oregon* communities are at the heart of OFP's preliminary injunction motion. *See, e.g.*, ECF 4-1 at 12 ("[F]or those Oregon communities that are attempting to follow FEMA's unlawful directives, they and their constituents are facing immediate and irreparable harm . . . ."). Other courts in this jurisdiction have explained that suits involving "water

---

[5] Relatedly, Plaintiffs note that the pending motions for summary judgment in Oregon pertain only to the merits of the Oregon plaintiffs' claims and that the Oregon court has deferred any decisions on remedy until after its decision on the merits. ECF 30 at 18. But that does not change the fact that the Oregon plaintiffs ask that court to declare that FEMA must immediately implement the RPA, whereas Plaintiffs ask this Court to declare the RPA unlawful and prevent FEMA from implementing it (or, at a minimum, prevent FEMA from doing so without further environmental review). The risk of inconsistent judgments arises at the Oregon case's merits stage, not just the remedy stage.

rights, environmental regulation, and local wildlife . . . should be resolved in the forum where the people 'whose rights and interests are in fact most vitally affected'" are located. *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. at 19–20 (quoting *Adams v. Bell*, 711 F.2d 161, 167 n.34 (D.C. Cir. 1983)). Such a rule applies here.

Plaintiffs dispute the application of that rule, but to little avail. In their amended complaint adding the National Association of Homebuilders as Plaintiffs and adding some allegations (which Plaintiffs filed two days after the Court ordered briefing on Defendant-Intervenors' anticipated motion to transfer), Plaintiffs newly allege that FEMA's implementation of the Biological Opinion would also "be felt nationally by NAHB, its affiliates, and its members." ECF 21 ¶ 25. Assuming the truth of those allegations, they suggest consequences of this suit that are not limited to Oregon. Still, that does not change the fact that Plaintiffs' arguments—and particularly their preliminary injunction motion—raise significant issues of Oregon state law and harm to Oregon communities and residents. In addition, Defendant-Intervenors, Plaintiffs, and the Federal Defendants disagree as to whether the agency decisions leading up to, and implementing, the Biological Opinion primarily occurred in Oregon or Washington, D.C. That particular issue does not appear to weigh strongly either way. But the presence of Oregon legal issues, Oregon municipalities, Oregon residents, and Oregon lands all weigh in favor of transfer to Oregon.

Finally, the third public-interest factor is neutral. Plaintiffs offer statistics showing that this District is less congested than the District of Oregon, but the difference is not substantial. *See* ECF 30 at 18–19 (pointing to a higher number of pending cases per judgeship and longer time from filing to disposition in the District of Oregon than D.D.C., but describing the difference as not "substantial[]" (internal quotation marks omitted)). "Absent a showing that either court's docket is 'substantially more congested' than the other, this factor weighs neither for nor against

transfer." *Ctr. for Biological Diversity v. Ross*, 310 F. Supp. 3d 119, 126–27 (D.D.C. 2018) (quoting *NAHB v. U.S. Env't. Prot. Agency*, 675 F. Supp. 2d 173, 178 (D.D.C. 2009)). Moreover, even if the difference in congestion were significant, it would not outweigh the inefficiency that would arise from both courts having to hear cases about the same Biological Opinion and do the extra work necessary to avoid conflicting orders.

Thus, the public-interest factors weigh heavily toward transfer to the District of Oregon.

## B. The private-interest factors weigh slightly against transfer, but not enough to outweigh the public-interest factors

The private-interest factors cannot overcome the public-interest factors' heavy weight. Indeed, only two of the six private-interest factors provide any argument against transfer, whereas one weighs slightly in favor of transfer and the rest are neutral.

Start with Plaintiffs' choice of forum. A plaintiff's choice of forum is ordinarily entitled to deference. *Trout Unlimited*, 944 F. Supp. At 17. That rule carries additional weight here because Plaintiff OFP is a resident of Washington, D.C., and Plaintiff NAHB has its primary place of business in D.C. ECF 30 at 7. *See Ctr. for Biological Diversity*, 310 F. Supp. 3d at 125 (D.D.C. 2018) ("When a plaintiff brings suit in its home forum, that choice is afforded 'substantial deference.' . . . That is so even when all plaintiffs do not reside in the chosen forum." (quoting *Wilderness Soc'y*, 104 F. Supp. 2d at 12)). At the same time, as Defendant-Intervenors note, Plaintiff OFP's membership is made up almost entirely of Oregon residents and municipalities, so it is those communities which it seems primarily to represent in the litigation and to whom irreparable harm would allegedly flow absent an injunction. ECF 26-1 at 21; ECF 32 at 13. Still, this factor offers some support against transfer.

So does Defendants' choice of forum, though only slightly. Federal Defendants also oppose transfer and prefer to litigate this case where their headquarters are and where key policy decisions

were made regarding the Biological Opinion, implementation of the RPA, and related policies. ECF 29 at 5–6. Still, Defendant-Intervenors counter that most of the key decisions were made at the regional office in Oregon, and they cite cases holding that involvement by federal agencies and officials located in D.C. is not determinative on this prong. ECF 32 at 15 (citing *Wyandotte Nation v. Salazar*, 825 F. Supp. 2d 261, 269 (D.D.C. 2011); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 25–26 (D.D.C. 2002)). This second factor is thus either neutral or weighs slightly against transfer.

The third factor, which asks where the claim arose, weighs slightly toward transfer, or is at best neutral. As demonstrated above, the Parties each point to aspects of the claims that arose in Washington, D.C., and others that arose in Oregon. Still, the filings indicate that the alleged injuries, whether to wildlife or to property, are being felt primarily in Oregon—just as the endangered species and land at issue are in Oregon. *See, e.g.*, ECF 4-1 at 41–53 (discussing Plaintiff OFP's alleged irreparable injuries in Oregon); ECF 9 at 25–28 (discussing injuries to Defendant-Intervenors and their members in Oregon). At minimum, this factor presents no hurdle to transfer.

Neither do the final three factors, all of which are neutral. As to the convenience of the parties, Federal Defendants regularly litigate (and already are litigating) in the District of Oregon, and neither they nor Plaintiffs claim any inconvenience from litigating in Oregon (where Plaintiffs are already litigating as amici). *See* ECF 30 at 12–13. And the Parties agree that the final two factors—convenience of the witnesses and ease of access to sources of proof—are neutral because this case will be litigated primarily on the administrative record and is unlikely to require witnesses or trial. ECF 26-1 at 23; ECF 30 at 13; ECF 29 at 5 & n.1 (deferring to Plaintiffs on these factors).

Taken together, the private-interest factors offer only minimal counterweight to the strong public-interest considerations in favor of transfer. Those public-interest factors, particularly the closely related litigation in Oregon, satisfy Defendant-Intervenors' burden, and they prove "decisive" despite some private-interest factors pointing the other way. 15 Fed. Prac. & Proc. Juris. § 3854 (4th ed.). Finally, the Court notes that Plaintiff OFP's motion for a preliminary injunction, which only just became ripe for resolution, will remain pending in Oregon for resolution by the transferor court. This Court cannot discern in that motion any specific deadline that would demand an immediate decision before transfer.

IV.    **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant-Intervenors' motion to transfer this case to the District of Oregon. ECF 26. Accordingly, the Court declines to rule on Plaintiff OFP's motion for a preliminary injunction, ECF 4, which will remain pending with the transferee court.

**SO ORDERED.**


DATE: March 17, 2025


_____
Jia M. Cobb
U.S. District Court Judge